**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 5:20-cr-140-GFVT-MAS-1 |
| ROBERT LEE ESTILL, ) | |
| ) | |
| Defendant. ) | |

**REPORT & RECOMMENDATION**

The Court, on referral from Judge Van Tatenhove, considers reported violations of supervised release conditions by Defendant Robert Lee Estill ("Estill"). [DE 35 at Page ID # 114]. Considering the record, proffer, and Estill's allocution at the revocation hearing, the Court does not recommend revocation of Estill's supervised release term, but it does recommend that the District Court impose additional supervised release conditions particularly targeting and directly tied to the instant violation conduct, to include a letter of apology to Estill's supervising probation officer and a mandatory community service commitment. The Court otherwise recommends that Estill continue serving his current term of supervised release, inclusive of participation in needed outpatient substance use disorder treatment, as previously ordered by Judge Van Tatenhove.

The overarching record reflects Estill's pattern of taking two steps forward, then one step back over the duration of his supervised release term. The undersigned is intimately familiar with Estill's characteristics and the chronology of his violations, culminating in the instant (least serious) technical-violation conduct. The sentencing factors and purposes counsel against wholesale revocation under the circumstances and, instead, demand a more targeted outcome specific to Estill's history and the relevant circumstances. Accordingly, the Court's carefully

tailored recommendation credits Estill's meaningful progress, though non-linear, and endeavors to provide him with tools and structure to promote future success on supervision and beyond, while simultaneously exacting an appreciable, logical consequence for the instant violations.

### I.     FACTUAL BACKGROUND[1]

On September 16, 2020, United States District Judge for the Southern District of Texas Diana Saldana sentenced Estill to 8 months' imprisonment followed by a 3-year term of supervised release for conspiring to transport an undocumented alien within the United States. [DE 1-2]. Given the time Estill had already served prior to final judgment, he was released from prison and began serving his term of supervised release on September 17, 2020. Estill's original Judgment included, *inter alia*, mandatory conditions prohibiting Estill from committing another crime or from unlawfully using a controlled substance. [*Id.* at Page ID # 7]. It also included standard conditions requiring Estill to report to the appropriate United States Probation Office ("USPO") as instructed, to live at an approved place, and to apprise the USPO of any changes in residence. [*Id.*]. Additionally, the Judgment reflected prospective special conditions requiring him to participate in substance use disorder treatment and to submit to drug testing as directed. [*Id.* at Page ID # 8].

The Southern District of Texas approved a transfer of jurisdiction to this District on November 20, 2020, and Judge Van Tatenhove accepted jurisdiction on November 23, 2020. [DE 1]. On that same date, the USPO in this District submitted a petition recommending revocation of Estill's term of supervised release based on alleged violations of the mandatory conditions referenced above, and Judge Van Tatenhove issued an arrest warrant. [DE 3]. This November 23,

---

[1] Though the instant factual recitation largely tracks the facts as reflected in the Court's prior recommendations on previous supervised release violations [*see* DE 17, 31], the Court here synthesizes the relevant background for purposes of record clarity.

2

2020 violation report stemmed from two cocaine-positive drug tests; a later report addendum noted a third positive test preceding the ultimate supervised release hearing. Estill admitted to cocaine use on each reported occasion.

The Court conducted the corresponding final revocation hearing on referral from Judge Van Tatenhove [DE 16] and, consistent with the recommended disposition [DE 17], Judge Van Tatenhove found Estill guilty of the reported violations, revoked Estill's supervised release, and sentenced him to time-served with 32 months of supervised release to follow [DE 22]. As a condition of the reimposed 32-month supervised release term, Judge Van Tatenhove required Estill to participate in 30 days of inpatient substance use disorder treatment followed by 60 days of outpatient treatment at the Schwartz Center in Lexington, Kentucky. [DE 23].

In late April 2021, after Estill had completed the initial 30 days of inpatient programming, USPO Officer Melissa Markwell ("Officer Markwell") became aware that Estill had been discharged from the facility due to noncompliance and was residing at an unknown location in Lexington. Officer Markwell further contacted Estill's daughter at Estill's previous address and requested that Estill report to the USPO, but Estill did not do so. On April 22, 2021, Officer Markwell thus submitted a violation report alleging that Estill had violated the standard conditions in his original Judgment requiring him to report to the USPO as instructed and to live at a USPO-approved residence. The April 22, 2021 violation report additionally alleged that Estill had violated Judge Van Tatenhove's special condition as reflected in the February 2021 Revocation Judgment, which required that Estill complete the 60-day outpatient portion of the treatment program.

At the accompanying final hearing in May 2021, Estill admitted to the alleged (Grade C) violations. [DE 30]. The resulting proposed Guidelines sentence was 5 to 8 months'

3

imprisonment, with a statutory maximum of 24 months' imprisonment and a maximum additional term of supervised release of up to 36 months, less any term of imprisonment imposed upon revocation. The Court recommended that the District Judge revoke Estill's term of supervised release and sentence him to 5 months' incarceration, to be followed by 24 months' supervised release, inclusive of an outpatient drug treatment condition. [DE 31]. Judge Van Tatenhove adopted the DE 31 recommendation and sentenced Estill accordingly in June 2021. [DE 33, 34]. As a part of Estill's Revocation Judgment, and consistent with prior terms of supervised release, Judge Van Tatenhove imposed the following conditions:

> **Standard Condition No. 13:** You must follow the instructions of the probation officer related to the conditions of supervision.
>
> **Special Condition No. 1:** You must participate in a substance abuse treatment program and must submit to periodic drug and alcohol testing at the direction and discretion of the probation officer during the term of supervision. Said program may include one or more cognitive behavioral approaches to address criminal thinking patterns and antisocial behaviors. You must pay for the cost of treatment services to the extent you are able as determined by the probation officer.
>
> **Special Condition No. 2:** You must refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance abuse testing which is required as a condition of release.

[DE 34].

Estill completed his 5-month incarceration term in late September 2021 and, on September 29,[2] timely reported to the USPO following his release from the Bureau of Prisons. At that time, USPO Officer Glenn Collins ("Officer Collins") requested a urine sample for drug testing purposes, pursuant to Special Condition No. 1. As Officer Collins represented in the ultimate Violation Report, Estill remained at the USPO for just over four hours but was unable to produce either a urine sample or a saliva sample that could be accurately tested. Eventually, Estill advised

---

[2] Estill's most recent term of supervision commenced on September 28, 2021, upon Estill's release from the Bureau of Prisons.

Officer Collins that he intended to leave, and—despite Officer Collins's advisement that Estill did not have permission to leave—Estill indeed left the office, in contravention of Officer Collins's express instructions. On October 1, 2021, Officer Collins submitted a Violation Report alleging Estill's violation of Special Condition No. 1 (Violation 1) and Standard Condition No. 13 (Violation 2).

On October 12, 2021, Officer Collins submitted an Addendum to the October 1 Violation Report. In it, he noted that Estill returned (without being so directed) to the USPO the following day to provide a urine sample. However, upon testing, the sample was reported to be dilute. Officer Collins observed that Estill had previously signed an acknowledgment that drinking excessive fluids prior to testing could impact the result and, believing that the dilute result indicated that Estill had tampered with testing, alleged an additional violation of Special Condition No. 2. Estill was arrested pursuant to the supervised release violation warrant on that same date.

## II.   PROCEDURAL HISTORY

On October 14, 2021, the Court conducted an initial appearance, pursuant to Federal Rule of Criminal Procedure 32.1, on the supervised release violations as alleged in the October 2020 Violation Report and Addendum. [DE 38]. The Court advised Estill of his constitutional rights, including his right to a preliminary hearing pursuant to Fed. R. Crim. P. 32.1(b)(1)(A). Estill knowingly, voluntarily, and intelligently waived his right to a preliminary hearing as to Violation 2 (alleging failure to follow the instructions of the probation officer – Standard Condition No. 13). [DE 38]. After a preliminary hearing as to Violation 1 (failure to submit to drug testing – Special Condition No. 1) and Violation 3 (tampering with drug testing – Special Condition No. 2), the Court found probable cause to conclude that the violations occurred as reported. [*Id.*]. The United

States did not seek Estill's detention pending a final hearing on the alleged violations, and the Court released Estill on previously imposed conditions.[3]

The Court conducted a final hearing on the alleged violations on October 20, 2021. [DE 41]. Estill stipulated to commission of Violation 2 as alleged in the October 1, 2021 Violation Report but contested Violation 1 as alleged in the October 1 Report and Violation 3 as reflected in the October 12, 2021 Addendum. As to Violation 2, the Court found Estill to be competent to enter a knowing, voluntary, and intelligent stipulation. For purposes of the Rule 32.1 proceedings, Estill admitted the factual basis for Violation 2 as described in the Report. Accordingly, the Court found that the United States established Violation 2 as reported, pursuant to 18 U.S.C. § 3583(e).

As to contested Violations 1 and 3, the Court heard testimony from one witness, Officer Collins, as well as statements and arguments from counsel. The burden rests on the Government to prove by a preponderance of the evidence that the violations occurred. *See United States v. Cofield*, 233 F.3d 405, 406 (6th Cir. 2000). Further, supervised release hearings are not guaranteed as stringent protections as criminal trials, including application of the Federal Rules of Evidence; rather, due process is satisfied provided the Court's determination rests on "reasonably reliable" evidence. *See, e.g.*, *United States v. Staton*, No. CR 6:06-107-KKC-HAI, 2016 WL 830953, at *1 (E.D. Ky. Mar. 3, 2016) (quoting *Taylor v. U.S. Parole Comm'n*, 734 F.2d 1152, 1155 (6th Cir. 1984)). Based on the reliable evidence before it and as discussed on the record during the final hearing, the Court ultimately recommends a finding that both Violations occurred as reported, for the reasons discussed below.

---

[3] Defendant's release hinged on his successful passing of a drug test, which occurred immediately after the preliminary hearing.

A.     **VIOLATION 1**

During the final hearing, Officer Collins presented testimony consistent with the allegations in the October 1 Violation report. [Hearing Recording, beginning at 08:45]. After timely reporting to the USPO upon his release from custody on September 29, 2021, Estill advised at approximately 11:00 a.m. that he could not provide a urine drug sample as Officer Collins requested (per Special Condition No. 1) because he did not then need to urinate. Officer Collins provided Estill with approximately 18 ounces of water, incrementally, over the next hour. [*Id.* at 09:15]. Officer Collins testified that, during that period and over the next several hours, Estill repeatedly complained about having to remain at the USPO to test, frequently using profanity and characterizing the process as "ridiculous." [*Id.* at 09:20–09:50]. Officer Collins further testified that Estill would alert officers that he was ready to urinate every few moments but, ultimately, be unable to provide a sample.

Additionally, Officer Collins stated that he attempted to obtain a saliva sample from Estill to test but was unable to do so. [*Id.* at 09:40–10:10]. Despite placing the swab in Estill's mouth for approximately 3-4 minutes—with specific direction to Estill to leave it under his tongue to ensure that it collects as much saliva as possible—the sample was too dry to permit accurate testing. [*Id.*]. Eventually, after just over four hours of attempted sample collection, Estill left the USPO against Officer Collins's direction, prompting Violation 2, to which Estill has stipulated.

The Court finds Officer Collins's testimony to be credible, reliable, and helpful in understanding the circumstances surrounding alleged Violation 1 and discerning whether it is more likely than not that Estill failed to "submit" to drug testing at Officer Collins's direction. At the outset, the Court notes that Estill's persisting inability to provide a urine sample over a period of four hours, despite consuming at least 18 ounces of water over a short period early on, is fairly atypical and indicates some likely resistance to testing. But, Estill's responsive argument—that

7

he was physically unable to urinate due to health issues—is plausible and prevents the evidentiary needle from crossing the preponderance mark on this fact alone.

When the Court factors in the surrounding circumstances, however, Estill's defense collapses. First, the Court notes as relevant Estill's uncooperative attitude toward testing and rude demeanor with Officer Collins throughout the course of September 29, culminating in Estill's abrupt, violative departure. Second, the Court observes that Estill has been able to successfully, and expediently, provide urine samples on multiple other occasions, casting some doubt on the extent of Estill's health issues and their degree of impact on his testing capacity. [Hearing Recording at 20:30–22:00]. Third, and most critically, the Court perceives the unsuccessful saliva sample collection attempt as further suggesting Estill's intentional resistance to testing. Estill has proffered no innocent, reasonable explanation for the failed saliva collection attempt.

Based on all of these circumstances, the Court finds that the evidence preponderantly establishes that Estill violated the condition that he "*must submit* to period drug and alcohol testing *at the direction and discretion of the probation officer . . .*" (emphases added). Estill's conduct does not demonstrate submission to drug testing at Officer Collins's direction, as required by the text and as contemplated by the sprit of Special Condition No. 1. Rather, collectively, Estill's pattern of behavior on September 29, in context of the full record and Estill's drug testing history, exhibits defiance and an unwillingness to participate in and permit effective drug testing as mandated. Accordingly, the Court recommends a finding that the United States has established, by a preponderance of the available evidence, Estill's commission of Violation 1.

B.     VIOLATION 3

Per the October 12 Addendum, Estill, without being directed to do so, reported to the USPO on September 30, 2021 and advised that he was ready to provide a urine sample. Estill readily provided a sample, but subsequent testing at Alere Laboratories revealed that the sample, though

8

negative for controlled substances, was too dilute (due to specific gravity) to permit accurate testing. [Hearing Recording at 17:00–17:20]. Officer Collins further testified that Estill was aware that drinking excess fluids prior to testing typically resulted in a dilute sample and that such conduct was not permitted. Specifically, in March 2021, Estill signed a "Notice to Offenders/Defendants Subject to Drug Testing" acknowledging that he understood that he was not permitted to drink excessive fluids prior to drug testing because it could interfere with testing accuracy and indicate efforts to avoid detection of unlawful drug use.[4] [*Id.* at 19:30–20:00]. Additionally, Officer Collins testified that he reiterated his concerns about excessive fluid intake and the potential for an impermissible dilute result to Estill during the September 29 urine sample collection saga. Thus, the record clearly confirms Estill's understanding that excessive pre-testing fluid intake would likely cause a dilute sample, and that a dilute sample would inhibit testing efficiency and accuracy, in potential violation of Estill's release conditions.

Lastly, the Court emphasizes again that Estill has historically been able to produce non-dilute samples without incident, rendering the September 30 occasion an apparent outlier. Per Officer Collins, Estill easily produced an accurate sample immediately following his preliminary hearing on these alleged violations (and, notably, as a predicate to his release at that time). [*Id.* at 21:00–22:00]. Estill also was able to produce two later samples, on different dates, without incident. This chain of events demonstrates that Estill's September 30 dilute was more likely attributable to intentional conduct (*i.e.*, excessive fluid intake) than to any pervasive, ongoing health or other issue. Importantly, Estill did not present any credible evidence indicating otherwise.

---

[4] The October 1 Violation Report's reference to a September 29 acknowledgement is typographical error; Officer Collins's testimony confirmed that Estill signed the relevant form in March 2021.

Accordingly, the evidence demonstrates that Estill more likely than not obstructed, or attempted to obstruct, the efficiency or accuracy of required substance testing.  Despite knowing that excessive fluid intake would interfere with the efficiency or accuracy of the test by causing a dilute sample, Estill engaged in conduct that ultimately did cause a dilute sample, which was unable to be accurately tested.  Officer Collins's testimony and the surrounding circumstances (including Estill's conduct and conversations with Officer Collins on September 29) further demonstrate that excessive fluid intake was the most likely cause of the September 30 dilute result.  And, Estill has not offered any persuasive contrary explanation for the dilute result on September 30, which stands in marked contrast with Estill's several other recent, non-dilute samples.

A preponderance of the proof shows that Estill engaged in knowing, intentional conduct that caused the September 30 dilute, such that he failed to "refrain from obstructing" the efficiency and accuracy of the test in violation of Special Condition No. 2.  For these reasons, the Court recommends that Judge Van Tatenhove find that Estill also committed Violation 3, as listed in the October 12 Addendum.

### III.    ANALYSIS

"Where there is more than one violation of the conditions of supervision, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade."  United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 7B1.2(b). With all violations being of equal Grade, the Court utilizes Grade C as the applicable category for purposes of this proceeding.  Estill's criminal history category as established at his original sentencing was Category III. [Judgment, Statement of Reasons, Page 1]. The parties do not dispute that the Guidelines propose a resulting sentence of 5 to 11 months' imprisonment, with a statutory maximum of 24 months.  *See* 18 U.S.C. § 3583(e)(3).  Should Estill's supervised release be revoked, the Court can re-impose an additional term of supervised

release of up to 29 months, given his prior term of imprisonment imposed upon revocation. *See* 18 U.S.C. § 3583(h). Under the Guidelines, and given the Grade C violation findings, the Court may revoke Estill's term of supervised release, extend it, or modify the conditions. U.S.S.G. § 7B1.3(a)(2).

The Court has evaluated the entire record and considered the arguments presented at the final hearing, the record concerning Estill's violations, the presentence investigation report, and the factors set forth in 18 U.S.C. §§ 3583(e) and 3553(a). In recommending a disposition and potential sentence, the Court must consider the nature and circumstances of Estill's original conviction, the statutory factors in 18 U.S.C. § 3553(a) as incorporated in § 3583(e), and the Guidelines range. *See also United States v. Johnson*, 640 F.3d 195 (6th Cir. 2011). Weighing all applicable considerations in context, the Court recommends that Judge Van Tatenhove not revoke Estill's present term of supervised release and permit him to continue under current conditions—including the needed outpatient substance treatment that Estill has yet to fully engage—as well as additional conditions requiring Estill to draft a letter of apology to Officer Collins and to complete 100 hours of community service over a period of five months (the Guidelines minimum) in lieu of revocation and further imprisonment.

The Court first considers the nature and circumstances of the instant violations and of Estill's original offense, as well as Estill's overarching history and characteristics. 18 U.S.C. § 3553(a)(1). These comprehensive considerations frame the instant analysis and largely drive the outcome, in the Court's view. Estill's original conviction was for conspiracy to transport an undocumented alien within the United States. [DE 1-2]. Though unlawful and evincing disrespect for the law, Estill's original offense circumstances were not particularly dangerous; they did not involve violence, weapons, or controlled substances. [*See* Presentence Investigation Report at ¶¶

11

7–15 (describing the offense conduct)]. Further, the offense appears to have been an isolated instance, rather than part of a broader pattern of related or escalating criminal activity. And, the instant violations are technical in nature and likewise unrelated to the original offense conduct. The relatively non-dangerous character of the original offense and the technical nature of the instant violations, as well as the absence of any broader pattern connecting the two, tip the nature and circumstances factor in Estill's favor.[5]

Estill's history and characteristics are somewhat mixed. Though he does have some criminal history as indicated in his Presentence Investigation Report, resulting in a criminal history Category III, the only convictions that generated criminal history points for purposes of his federal sentencing on the transport conspiracy offense were misdemeanors (shoplifting). [*Id.* at ¶¶ 30–35].[6] As discussed in its prior recommendations, these misdemeanors apparently stemmed from petty theft of food and other essential items, and the Court discounts them as indicators of present criminality that would weigh in favor of revocation. Significantly more concerning, though, is the thread of past cocaine use, and, relatedly, Estill's history of supervised release violations. This is Estill's third supervised release proceeding before the Court in less than one year of supervision in this District, a fact that weighs in favor of revocation.

Notably, however, the Court recognizes that the sequential violations have been of steadily diminishing, rather than escalating, severity. Estill's first set of violations was inarguably the most serious, as it involved multiple cocaine-positive tests and related dishonesty to Officer Markwell.

---

[5] The Court acknowledges that Estill received a below-guidelines sentence of 8 months on his original offense, despite a range of 18-24 months. Though this factor weighs slightly against Estill in the current posture, it is outweighed by the more recent and relevant factual record before the Court. The prior downward variance thus has little impact, overall, in the present revocation calculus.

[6] Two much earlier felonies (in 1981 and 1992) did not accrue points due to their age, and the Court does not perceive them as relevant to the instant analysis.

12

[DE 17]. In then recommending revocation and inpatient treatment, the Court emphasized Estill's continued use of cocaine even after USPO intervention, demonstrating both a serious substance use issue and a worrisome lack of concern for consequences. Following revocation, Estill completed his time-served sentence and the required 30 days of inpatient substance use disorder treatment. Though Estill quickly violated again by absconding from the outpatient portion of the treatment program (and then subsequently failing to reside at an approved residence), this second set of violations did not involve any further unlawful substance use, reflecting at least some treatment progress. Still, emphasizing Estill's failure to maintain contact and communication with Officer Markwell (substantially breaching the Court's trust, particularly in light of the prior time-served sentence), the Court again recommended revocation of Estill's supervised release term and, that time, a 5-month imprisonment sentence, which Estill has since served.

     As to the instant violations, it is aggravating that the conduct occurred immediately after Estill's release from custody on the prior violations. However, Estill nonetheless reflects some continued personal progress on release. Importantly, he has passed multiple drug tests since his initial appearance on the alleged violations; the substance use disorder treatment, to the extent Estill has participated to date, has been effective. This encouraging trend largely assuages the most problematic part of Estill's recent history and characteristics (his prior cocaine use). Additionally, in contrast with his prior failure to communicate with the USPO, Estill here exhibited appropriate initiative in approaching and maintaining contact with Officer Collins. Estill, though ultimately uncooperative, voluntarily appeared at the USPO as directed on September 29. Further, despite surely anticipating an alleged violation based on his September 29 departure, Estill still appeared at the USPO on the morning of September 30, without even being directed to do so.

These facts weigh in Estill's favor and indicate that, despite his commission of new, technical violations in this instance, Estill has endeavored to remedy the Court's key substantive concerns, as previously addressed—namely, Estill's cocaine use disorder and his failure to alert the USPO to his whereabouts or to communicate with his supervising officer. Those concerns, particularly in conjunction, largely drove the first and second revocation and sentencing recommendations. And, as discussed, the instant violations—both in a vacuum and against the longitudinal backdrop of Estill's history and prior violations—are qualitatively less serious. This situation calls for a different, more nuanced non-revocation consequence, as guided by the remaining § 3553(a) and U.S.S.G. § 7B considerations and discussed *infra*. For these reasons, on balance, the Court views the critical § 3553(a)(1) considerations as weighing against revocation of Estill's current term of supervised release.

The § 3553(a)(2)(B)-(C) and (a)(5)-(7) factors have little bearing on the result in this matter. There is no restitution obligation at issue, there are no obviously governing sentencing policy statements, and there is little need to protect the public from Estill, particularly given his apparent current sobriety and recent series of negative drug tests. Nor is the risk of unwarranted disparities a significant factor, given the highly fact-intensive and circumstance-specific nature of the alleged violations and of Estill's holistic record before the Court. And, finally, though there is legitimate need to deter Estill from future technical violations, the Court is confident that it can effectuate this discrete purpose by targeting the instant violations' root cause—Estill's general obstreperousness—sans revocation.

The sole factor clearly weighing in favor of revocation and a custodial sentence is the Guidelines range. The proposed range of 5 to 11 months' imprisonment decidedly favors both. However, the Guidelines (intentionally and appropriately) are a broad brush, and they obscure

critical subtleties that ultimately counsel a non-revocation result in this situation. First, along the spectrum of Grade C violations, Estill's violations are factually on the less-serious end. Moreover, as discussed, aspects of Estill's conduct (including his voluntary return to the USPO on September 30 and eventual negative drug tests) are mitigating. Additionally, Estill's criminal history category III slightly overstates his prior criminality, given the point-accruing misdemeanors. All of these considerations generate a 5-11-month Guidelines range that, for the reasons discussed, does not precisely or accurately reflect the instant balance of sentencing factors and purposes. Accordingly, though the Court properly treats the applicable Guidelines range as a magnet drawing the Court toward a particular result and range, the countervailing considerations are collectively strong enough to compel a non-Guidelines outcome in this case.[7]

Lastly, the Court carefully considers the need to provide Estill with corrective and other treatment in the most effective manner possible. *See* 18 U.S.C. § 3553(a)(2)(D). The record confirms that Estill requires ongoing substance use disorder maintenance and that such treatment has been effective to date. The Court perceives that continued participation in outpatient substance use disorder programming (inclusive of cognitive and behavioral treatment, as appropriate) on

---

[7] The Court does not view this as a mandatory revocation scenario under U.S.S.G. § 7B1.4, Application Note 5, or 18 U.S.C. § 3583(g). The Government did not characterize it as such. The Court sees dispositive daylight between categorical refusal to comply with a mandatory drug testing requirement, as § 3583(g) envisions, and Estill's intractability that functionally prevented effective testing in accordance with Special Condition No. 1. Estill did not *refuse* to test, and though he left the USPO without permission (perhaps an implicit refusal to continue attempting to test on that precise date), his voluntary return the following morning undercuts a finding that he actually refused to comply with the testing requirement. Instead, Estill's instant Violation 1 centers on the specific wording of the relevant condition, which required him to cooperatively *submit* to drug testing at the specific direction of the supervising officer. Though the difference is in degree rather than kind, Estill's violation (of Special Condition No. 1 as particularly phrased) entailed passive, rather than active, resistance to the drug testing requirement; his obstinance clearly impeded the process on September 29 but did not rise to the level of active refusal, as would require revocation. This factual distinction further highlights the Guidelines' inability to capture the precise balance of considerations in this particular case.

15

release is critical in safeguarding Estill's recent sobriety.  Such programming would also provide Estill with constructive coping strategies that will surely aid in emotional growth and positively impact his interpersonal relationships, including his relationship with supervising officers.  Further incarceration would do little to advance the supervised release objectives in this case and is not reasonably tied to the driving sentencing factors or purposes.

The root of Estill's instant violations is his stubbornly uncooperative attitude toward supervision, drug testing, and Officer Collins in late September 2021.  It is imperative that Estill realize that such recalcitrance can, as it has here, rise to the level of a supervised release violation when it hinders important, mandatory supervised release functions, including the requirements that Estill submit to and enable accurate drug testing and follow all instructions from supervising officers.  This conduct is in violation of Estill's release terms and breaches the trust the Court has placed in him.  *See* U.S.S.G. § 7, Pt. A. intro. comment 3(b).  Therefore, it properly triggers the supervised release revocation process and necessitates a thorough, comprehensive analysis of the circumstances and relevant factors.

Having undertaken the full inquiry here, the Court recommends against revocation, for the reasons discussed.  Permitting Estill to make progress in rebuilding his life on release, and to finally engage with the outpatient treatment previously imposed, would best serve the statutory purposes and fairly reflect all sentencing factors, given the technical nature of the instant violations.

However, consistent with § 3553(a)(2)(D)'s effective corrective treatment aim, the Court recommends that Judge Van Tatenhove modify Estill's supervision conditions to additionally require that he complete a total of 100 hours of community service over the course of 5 months—what otherwise would be Estill's Guidelines minimum incarceration period.  Using this time to engage in structured service will benefit not only the community, but also Estill by prompting

16

community engagement within an organized, monitored framework. The chief harm in Estill's most recent conduct is its senseless misuse of limited Court, Government, and USPO time and resources. The USPO plays an invaluable role in bettering the community and individual defendants' lives, and Estill's lack of cooperation on September 29 wasted Officer Collins's time and the USPO's resources generally. To the extent Estill's conduct has been an unwarranted drain on limited communal resources, it is appropriate that he give back to the community via his own time and service. In light of Estill's financial circumstances, employment condition, and other personal obligations, the Court recommends a modest 100-hour / 5-month requirement; the intent is simply that Estill use a reasonable portion of his leisure time over the next 5 months to reinvest some of the resources that he has dissipated.

Relatedly, the Court recommends that Estill be required to write a letter of apology to Officer Collins, defining Estill's personal goals for the remaining term of supervision and outlining a plan to achieve them. The instant violations reflect unacceptable disrespect toward Officer Collins—who plays a critical role in Estill's success on supervision—and further evince a poor start to Estill's current release term. Though revocation is inapt, the instant conduct indicates that Estill must thoughtfully and intentionally reconfigure his approach toward supervision. The Court thus would recommend that Estill be required to articulate a warranted apology to Officer Collins and a concrete plan for success going forward, ideally shifting Estill's supervision perspective.

## IV.    CONCLUSION

Accordingly, for the reasons stated herein, the Court **RECOMMENDS** that:

(1) Estill be found guilty of all current reported violations;

(2) Estill be permitted to continue serving his current term of supervised release; and

(3) Estill's conditions of supervised release be **MODIFIED** to add the following additional Special Conditions:

    a. Within five months of the District Court's resolution of the October 2021 violations, Defendant shall complete 100 hours of community service. The nature and details of such service shall be determined by the supervising United States Probation Officer in his or her discretion.

    b. Within two weeks of the District Court's resolution of the October 2021 violations, Defendant shall submit a brief written letter of apology to supervising United States Probation Officer Glenn Collins. The letter shall further include Defendant's goals for the current supervision term and intended steps toward achieving them.

Estill preserved his right of allocution. Absent a waiver of allocution, this matter will be placed on Judge Van Tatenhove's docket for an allocution hearing upon submission.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within 14 days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

Entered this 2nd day of November, 2021.



Signed By:
Matthew A. Stinnett  MAS
United States Magistrate Judge